141 SOUTH MAIN, INC., Plaintiff-Appellant, *v.* MAGIC FINGERS, INC., *et al.*, Defendants-Appellees.

Fourth District    No. 13637

Opinion filed June 13, 1977.

Thomas, Mamer, Haughey & Miller, of Champaign (Thomas F. Kolter, of counsel), for appellant.

Bane, Allison, Saint & Bliss, of Bloomington (William A. Allison, of counsel), for appellees.

Mr. JUSTICE MILLS delivered the opinion of the court:

Magic Fingers ( a sensuous appellation! ) is a manufacturer of vibrating bed devices, commonly found in public inns for the relaxation and soothing of the weary traveler.

141 South Main (a singular title for a corporate entity) owns and leases the Ambassador Motor Inn in Decatur where such oscillating machines were installed in 1965.

141 filed suit to recover damages caused by a fire which allegedly started in one of these bed vibrating devices manufactured by Magic Fingers, and owned (and installed) by defendant Lee Brooks. The complaint consisted of one count based on *products liability,* one on *breach of implied warranty* and two counts based on negligence. The trial court directed a verdict on all counts for the defendants Magic Fingers and Brooks, and 141 appeals.

The issues concern the directed verdicts and evidentiary rulings. In sum, we reverse and remand for a new trial on the products liability and implied warranty counts.

But first, some brief facts.

The owner of the vibrators from the time of their installation until April 1971 was Lee Brooks, franchisee for Magic Fingers in Decatur. The oscillators were actually installed by Vincent Albert who worked for Mr. Brooks. The coin-operated machines were leased to the Ambassador, which split the money obtained with Mr. Brooks.

On December 3, 1971, a fire occurred in Room 728. The occupant had put a quarter into the device, which did not work until after it had been shaken or slapped. It started working and very shortly thereafter there was a crackling sound. The occupant looked under the bed and saw sparks shooting up. He called the desk, and hotel employees first attempted to put out the fire themselves. Eventually, the fire department was called. Extensive damage resulted from the fire.

A Decatur fire inspector testified that, although he himself had no opinion on the cause of the fire, the official Fire Department records indicated it had been caused by the bed vibrating device. Extensive evidence was introduced concerning proper installation and the actual installation of the devices in the Ambassador. The vibrator from Room 728 was not available at trial.

Jeremy Davis, a consulting engineer, testified that, in his opinion, the fire was caused by a short circuit in the cord of the device. The covering of the cord would rub up against the springs of the bed or the clamps used to attach the cord to the bed frame. Eventually, because of the movement

(of the machine itself, of the people on the bed, of the bed during cleaning) the covering could wear through and the device would short-circuit. He examined other cords on vibrators at the Ambassador and found cords which were pinched or penetrated although not entirely worn through. He testified that there were alternatives which existed at the time the devices were installed which would provide better protection than the covering used by Magic Fingers. These alternatives included metal braided cable or a light protection piece through which the cord could travel.

## DEFECTIVE PRODUCT AND
## IMPLIED WARRANTY OF MERCHANTABILITY

The trial court directed a verdict for Magic Fingers on these two counts at the end of the plaintiff's case. 141 argues that this was error—and we agree.

■■■ To present a prima facie case 141 South Main must prove three elements: (1) that the injury resulted from a condition of the product; (2) that the condition was unreasonably dangerous; and (3) that the condition existed at the time it left the defendant's control. (*Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612, 623, 210 N.E.2d 182, 188.) The defective condition need not manifest itself immediately (*Larson v. Thomashow* (1974), 17 Ill. App. 3d 208, 307 N.E.2d 707) and it should be considered whether the defect is of such a character as to cause a delayed reaction. A lack of safety devices may cause a product to be unreasonably dangerous. *Stanfield v. Medalist Industries* (1975), 34 Ill. App. 3d 635, 340 N.E.2d 276.

The trial court relied on *Rios v. Niagara Machine & Tool Works* (1974), 59 Ill. 2d 79, 319 N.E.2d 232, in directing a verdict for the defendants, interpreting its holding as a retreat from *Suvada*. We do not, however, read *Rios* in such manner or as saying that there is no duty on the manufacturer to install a safety device on its product. Although the appellate court had held that a manufacturer of a multifunction machine with many safety devices possible (depending on the particular operation) did not have a duty to supply such safety devices, the supreme court specifically declined to base its holding on such a theory. In *Rios*, the employer had installed the safety device but it failed. The supreme court held that plaintiff had failed to prove the first element: that the injury resulted from a condition in the product. The injury, in fact, resulted from a failure of the safety device. In addition to the fact that the product in question here is not a complex multifunctional machine like a punch press, recent authority has expressed doubts that a manufacturer can in any case delegate a duty to furnish a safe machine. *Scott v. Dreis & Krump Manufacturing Co.* (1975), 26 Ill. App. 3d 971, 326 N.E.2d 74.

In the case at bar, Ambassador's expert testified that the fire was caused by the short-circuiting of Finger's device, and that the nature of the cord covering was dangerous because of its softness and location in a place that allowed the cord to be rubbed. The condition of the cord existed at the time it left Finger's control. In short, the expert testified to all the elements required by *Suvada.*

■■ Magic Fingers cites cases that state the standard of proof in defective design cases: (1) the product as designed is incapable of preventing the injury complained of; (2) an alternative design existed which would have prevented the injury; and (3) the alternative design was feasible in terms of cost, practicality and technological possibility. (*Sutkowski v. Universal Marion Corp.* (1972), 5 Ill. App. 3d 313, 281 N.E.2d 749; *McClellan v. Chicago Transit Authority* (1975), 34 Ill. App. 3d 151, 340 N.E.2d 61.) Magic argues that neither (1) nor (3) were proved. They concede, however, that the expert testified that alternative designs were feasible. Yet, a careful reading of the testimony also shows that the expert testified that the cord as designed was incapable of preventing this kind of injury arising out of the short-circuiting. We need not at this time decide whether plaintiff must prove that the alternative design is feasible in terms of cost, practicality and technological possibility, although we have some doubts as to whether these elements are essential rather than merely relevant and material. In the case before us the expert testified that alternative designs included metal braided cable or a light protection piece through which the cord could pass. Considering the relative simplicity of this product, its alleged defect and the alternative designs, a jury could properly have found that the alternatives were practical and not costly. See *Lolie v. Ohio Brass Co.* (7th Cir. 1974), 502 F.2d 741.

■■ Fingers also argues that the directed verdict was proper because the evidence shows that the condition of the product was not the cause of Ambassador's damage. The cause, it contends, was the tardiness in calling the fire department. There was some evidence of a half-hour delay. There was, indeed, testimony that damage could have been confined if the fire department had been called immediately. However, there was also evidence of a much shorter delay and it would seem to be a question for the jury whether the hotel employees acted reasonably under the circumstances. There is also the issue of whether 141 can be held responsible for the hotel employees' actions.

## NEGLIGENCE

■■ The hotel owner alleged in its complaint that Magic Fingers and Mr. Brooks were negligent in the installation and maintenance of this quivering device and in their failure to warn of the danger. The trial court

directed a verdict for defendants on these two counts at the close of all the evidence. We concur in the trial judge's assessment.

Ambassador points to the following evidence which, it urges, establishes negligence on the part of Brooks: (1) that hog rings were used to fasten the cord to the bed and such rings have sharp edges which may puncture the cord unless it is installed very carefully; (2) that Brooks' only method of checking the devices was to insert a quarter to see if the unit worked and that he never checked the units themselves; and (3) that, as determined by a random sample of other beds, the devices were not installed properly.

The court directed the verdicts because of significant gaps in the proof and we agree with its reasoning. The prime factor was that the actual unit alleged to have caused the fire could not be produced, nor was it examined in detail by anyone who testified. The secondary factor is that Mr. Brooks had given up his franchise eight months before the fire and no proof as to maintenance or operation during that period was introduced. Since there was no testimony directly concerning negligence in the installation or maintenance of the particular unit which (it was alleged) caused the fire, the proof failed.

## EVIDENTIARY RULINGS

Because several issues are likely to come up on retrial, we will address the contentions that the trial court erred in certain evidentiary rulings.

■■ Ambassador argues that the trial court erred in limiting the evidence on damages. The hotel was not permitted to show loss of profits from smoke-damaged rooms which could not be rented. The lease calls for a minimum rental plus a percentage of the profits, and it is undisputed that Ambassador received the minimum. The trial court held that plaintiff's only damage was to its reversionary interest. However, when the tenant's enjoyment of the premises is disturbed by another's tortious conduct and that causes loss of rent to the landlord, the landlord may recover. See *Younggreen v. Shelton* (1901), 101 Ill. App. 89.

■■ 141 South Main contends further that it was error to introduce into evidence regulations of the State Fire Marshal pertaining to required fire alarm systems because the City of Decatur had promulgated its own regulations and, therefore, the State Fire Marshal's were not applicable. Fingers argues that the rules tend to establish a standard of care on the part of the owner and are therefore admissible. We agree with Fingers. In Structural Work Act cases, rules of the Industrial Commission are admissible even though the rules are binding only between employer and employee. Even though Fingers and Brooks are not employers, the rules furnish evidence of the proper standard of care. *Scrimager v. Cabot*

*Corp.* (1974), 23 Ill. App. 3d 193, 318 N.E.2d 521; *Avery v. Moews Seed Corn Co.* (1971), 131 Ill. App. 2d 842, 260 N.E.2d 561.

Accordingly—for these reasons—the direction of verdicts for Brooks and Magic Fingers on the negligence counts are affirmed and the direction of verdicts for Magic Fingers on the products liability and warranty counts are reversed and remanded for a new trial.

Affirmed in part, reversed in part, and remanded with directions.

CRAVEN, P. J., and GREEN, J., concur.